IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-01006-RBJ

GEMALTO S.A.,

Plaintiff,

v.

CPI CARD GROUP INC.,

Defendant.

---

**CPI CARD GROUP INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

---

The parties have narrowed the disputed terms for *Markman* to 3: (1) "link"; (2) "management interface"; and (3) "customizing data server"/"devices that deliver customizing data." This brief addresses only the indefiniteness of the "customizing data" terms.[1] For the other two terms, the parties will provide a joint claim construction chart to the Court on June 15, 2017.

The phrases "customizing data server" and "devices that deliver customizing data" appear in independent claims 1 and 13, respectively, of the U.S. Pat. No. 6,786,418. *See* Ex. A[2]. These phrases are indefinite under 35 U.S.C. § 112 ¶ 2[3] because the

---

[1] CPI's Opening Brief is without prejudice to raise additional § 112 issues in the future, including lack of enablement and written description.
[2] Exhibits cited herein are to the Declaration of Melinda K. Lackey in support of CPI Card Group's Opening Claim Construction Brief, filed concurrently herewith.
[3] Post-AIA, this section has been renumbered § 112(b) without substantive change.

-1-

specification contradicts the claims, and the inventor's testimony shows that neither the specification nor the claims capture his alleged invention.

"Indefiniteness is a matter of claim construction, and the same principles that generally govern claim construction are applicable to determining whether allegedly indefinite claim language is subject to construction." *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008). "[I]f [a patent's] claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention," it is invalid. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).

Here, the two "data server" terms are indefinite at least because there is no direction from the relevant field, the patent, the file history, or even the inventor as to what these terms actually are and what they do in the context of the '418 patent. As explained in the Court's March 2, 2017 Order, the '418 patent is apparently directed to a specific problem: traffic jams. ECF No. 66 at 2-3; *see also* Ex. A ('418 patent) at 1:44-50 ("these data exchanges are effected by means of a communication bus … [h]owever, the capacity of the bus is insufficient for [m]anaging such a volume of data exchanges."). The patented solution is to segregate customizing data and encrypting data into their own dedicated lanes, "using an architecture for communication between the customizing appliances or lines and the peripheral devices in which <u>on the one hand</u> the customizing lines receive customizing data through a communication [bus] and <u>on the other hand</u> a data server supplies the encrypting data to the customizing lines by means of computer links, the encrypting data being supplied by peripheral encrypting devices via computer

links." *Id.* at 1:58-65 (emphasis added). The two types of data are intended to be transmitted differently. And the "data server" described in the specification supplies *only* encrypting data – the patent goes on to say that it "limit[s] the data traffic on the communication bus by allocating it to the customizing data, the encrypting data being conveyed by other computer links." *Id.* at 1:66-2:2. Figure 1 of the patent is provided here:



FIG. 1

In Figure 1, the data are separated—the encryption data travels from the "DEP[s]" through "links" or "lines" (LD1, LS6) to the "customizing stations" (PP1). Ex. A ('418 patent) at 3:53-56, 4:6-11; Fig. 1. The customizing data never leaves the 'customization side' (as Mr. Maurel testified, Ex. B (Maurel Dep. Tr.) at 48:20-49:4), it should be securely kept) as it travels from the "DC" or "control device" through the "BC" or "communication bus" to the "customizing stations." Ex. A ('418 Patent) at 3:48-51 ("a communication bus BC for transmitting, to each customizing station PP1 to PP6 the customizing data for

each smart card CP1 to CP6 supplied by the control device DC"). Then, both sets of data can be imprinted on the smart card (CP1).

This all seems straightforward until one gets to claims 1 and 13, where only a "*customizing* data server" is claimed.[4] Thus, the claims appear to require an architecture that is completely divorced from the specification:



Basically, the customizing station sends "customizing data requests" to the management interface, which sends them to a "customizing data server" "as soon as" that "customizing data server is available," which then turns around and returns "customizing data" to the management interface, which *then* transmits it to the requesting "customizing station." *See* Claims 1 and 13. These components are, according to the claims, connected by "bi-directional link[s]" (claim 1) or "serial links" (claim 13). *Id.*

The problem is that there is no "customizing data server" anywhere in the specification (except where the claim language is simply copied and pasted at 2:20-37) or described in Figure 1:

---

[4] The same arguments apply to claim 13's "devices that deliver customizing data."



There is no "customizing data server" in Figure 1.  The only component identified by the specification that services "customizing data" is the "DC" or "control device."  Ex. A ('418 Patent) at 3:46-47 ("a control device DC containing the customizing data for each card to be customized").  However, the "DC" is subsumed *within* the customizing machine (not separated by two bi-directional links and a management interface).  The specification does not say how the customizing data server (regardless of wherever it is) actually services customizing data or transmits it (as required by the asserted claims).  According to the specification, customizing data is only transmitted by the communication

bus (highlighted in yellow above – again *within* the customizing machine), while "lines" or "links" are dedicated solely to the encrypting data in order to relieve the data "traffic jam."  The only connection shown in Figure 1 and described in the specification *between* the management interface and the customizing machine are "lines" or "links," which cannot carry customizing data as the claims require.

Gemalto may try to argue that the "SD" is the "customizing data server," but this is no less confusing for a person of ordinary skill in the art.[5]  Like the DC of Figure 1, the SD is not configured correctly according to the asserted claims.  While it is located at the far end of the configuration, it is only connected to other components via "links" which only carry encrypting data.  Ex. A at Fig. 1 (disclosing only "LS" links connecting the customizing machine to the SD component).  There is no configuration disclosed in which customizing data (or customizing data requests) travel over a separate line from encrypting data (or encrypting data requests) if the SD is the "customizing data server." Finally, if the "SD" is the "customizing data server," then there is no disclosure of its connection to the claimed management interface as the SD is only connected to the customizing machine, with no intermediary.

The answer is not clear from the face of the patent, and the inventor doesn't know. Mr. Maurel testified that his "invention" was "to allow the connection of … the D[ata] E[cryption] P[eripheral], to the Datacard 9000." Ex. B (Maurel Dep. Tr.) at 20:5-7.  And,

---

[5] Gemalto is also precluded from arguing that the DC is the "customizing data server" as dependent claim 16 "further" recites a "control device that provides additional customizing data to said customizing stations."  Ex. A ('418 patent) at claim 16.

critical for this motion, Mr. Maurel was unable to identify his invention in the French counterpart of Figure 1 of the '418 patent:

> Q: Can you tell me which figure in Exhibit 5, the invention disclosure, would correspond to the architecture in Figure 1 of the French patent application?
>
> A. I will try. None.

Ex. B (Maurel Dep. Tr. at 88:20-89:1) discussing Exhibit C (French priority application) at 16 (providing the identical architecture of Figure 1 of the '418 patent). Not even Mr. Maurel, the alleged inventor, understands what all the different claimed components are or what they are supposed to do—a highly relevant data point when considering whether a claim is indefinite.[6] As a general rule, an inventor will be a person of at least ordinary skill in the relevant art. *Two Moms & a Toy, LLC v. Int'l Playthings, LLC*, No. 10-CV-02271-PAB-BNB, 2012 WL 5187757, at *2 (D. Colo. Oct. 19, 2012) (Brimmer, J.) ("[I]t is undisputed that . . . an inventor . . . qualifies as a person of ordinary skill in the relevant art.") (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005)); *Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*, 14 F. Supp. 3d 588, 591 (D. Del. 2014) (denying patentee summary judgment on indefiniteness where an inventor did not understand what a claim term meant); *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, No. CIV.A.MJG-01-1504, 2007 WL 5582228, at *5-6 (D. Md. Jan. 19, 2007) (relying on

---

[6] Notably, Mr. Maurel also testified that he never reviewed any correspondence with the United States PTO, never reviewed any office actions, amendments, or responses. He was not aware that the patent had even issued until his deposition. Ex. B (Maurel Dep. Tr.) at 76:21-78:13.

inventor testimony which established "that one skilled in the art cannot know, from the patent, how to conduct a curing operation that will achieve the intended result in light of the many variables associated with curing."). Under *Nautilus, Inc.*, the reasonable scope of a claim must be ascertainable by a person of ordinary skill in the art. 134 S. Ct. at 2124.

For the foregoing reasons, CPI respectfully requests that this Court hold the terms "customizing data server" and "plurality of devices that deliver customizing data" indefinite and hold all of the asserted claims of the '418 patent invalid.

Respectfully submitted,

Dated: May 5, 2016

WINSTON & STRAWN LLP

By: */s/ David S. Bloch*

| | |
|---|---|
| Krishnan Padmanabhan | David S. Bloch, |
| 200 Park Avenue | 101 California Street |
| New York, NY 10166-4193 | San Francisco, CA 94111-5802 |
| Telephone: (212) 294-6700 | Telephone: (415) 591-1000 |
| Facsimile: (212) 294-4700 | Facsimile: (415) 591-1400 |
| Email: kpadmanabhan@winston.com | Email: dbloch@winston.com |
| | |
| Louis L. Campbell | Dustin J. Edwards |
| James C. Lin | Melinda K. Lackey |
| CA Bar No. 271673 | Donald Mahoney, III |
| 275 Middlefield Road, Suite 205 | 1111 Louisiana, 25th Floor |
| Menlo Park, CA 94025 | Houston, TX 77002 |
| Telephone: (650) 858-6500 | Telephone: (713) 651-2600 |
| Facsimile: (650) 858-6550 | Facsimile: (713) 651-2700 |
| Email: LLcampbell@winston.com | Email: dedwards@winston.com |
| Email: jalin@winston.com | Email: mlackey@winston.com |
| | Email: TMahoney@winston.com |

**COUNSEL FOR DEFENDANT,
CPI CARD GROUP INC.**

## **CERTIFICATION OF COMPLIANCE**

Counsel of Record hereby certifies that pursuant to D.C.Colo.LPtR 17, CPI CARD GROUP INC.'S OPENING CLAIM CONSTRUCTION BRIEF contains approximately 1853 words (inclusive of certifications), which is less than the total words permitted by the rules of court. Counsel relies on the word count of the computer program used to prepare this brief.

Date: May 11, 2017

/s/ *Melinda K. Lackey*
Melinda K. Lackey

## **CERTIFICATION OF SERVICE**

The undersigned certifies that on May 11, 2017 the foregoing claim construction brief and exhibits thereto was served on all counsel of record by electronic mail.

/s/ *Ying Lin Steinberg*
Ying Lin Steinberg
Paralegal