IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-01006-RBJ

GEMALTO S.A.,

      Plaintiff,

v.

CPI CARD GROUP INC.,

      Defendant.

---

**GEMALTO'S RESPONSE TO CPI'S OPENING CLAIM CONSTRUCTION BRIEF**

      CPI asserts that the claim terms "customizing data server" (claim 1) and "devices that deliver customizing data" [1] (claim 13) are indefinite under 35 U.S.C. § 112, ¶ 2[2] and has declined to propose any construction for these terms.  Neither term is indefinite.  CPI's indefiniteness argument, based entirely on self-created false ambiguities, should be rejected, and both terms should be construed according to Gemalto's proposed constructions. [3]

---

[1] CPI refers to these two terms as the two "data server" terms.  Gemalto will in this Response, as CPI has done in its Opening Brief, argue the two terms simultaneously, for convenience referring to "customizing data server" (or "data server" or "device" in context) as meaning both the term "customizing data server" of claim 1 and the term "devices that deliver customizing data" of claim 13.  In doing so, Gemalto is not waiving any right to assert that a "data server" and a "device" may mean different things or incorporate different components, and thus a "customizing data server" and a "device that delivers customizing data" may mean different things, respectively.  *See* "Gemalto's Proposed Constructions" at § I, p. 2. CPI has made no attempt to distinguish between the two terms.

[2] 35 U.S.C. § 112(b) post-AIA.

[3] Offering no construction, CPI is attempting to turn the hearing on these two terms into one of summary judgment.  "[W]hether to decide indefiniteness during claim construction depends on why the alleged infringer asserts that the claim is indefinite. When a claim is asserted to be indefinite because it has *no* meaning to a person skilled in the art, an indefiniteness decision at the claim construction stage may be practically

## I.    GEMALTO'S PROPOSED CONSTRUCTIONS

Gemalto proposes the following claim term constructions, which a person of ordinary skill in the art ("POSITA") would understand with reasonable certainty:[4]

- **"customizing data server"** -- "*a computer processor and/or software that is capable of at least receiving requests for data used for personalization of a smart card and sending data used for personalization of a smart card"*
- **"devices that deliver customizing data"** – "*a computer or peripheral hardware that is capable of at least sending data used for personalization of a smart card"*

## II.    THE CUSTOMIZING DATA SERVER IN FIGURE 1

CPI wrongly contends the customizing data server in the '418 patent is missing. Fig. 1, clarified by annotations below, shows CPI is wrong.



FIG. 1

unavoidable.  But in other situations, the issues may not be as closely dependent on each other, and therefore an indefiniteness decision will be better left for decision at summary judgment, on a more developed record."  *Cipher Farms, Inc. v. Actavis Labs. Fl, Inc.,* 99 F.Supp.3d 508, 514 (D.N.J. 2015) (emphasis in original).

[4] Gemalto will provide citations to further intrinsic evidence and to extrinsic evidence in the Joint Claim Construction Chart ("JCCC") to be filed on June 15th.

The customizing data delivered to the management interface comes from the data encryption peripherals, or "DEPs".  Thus, in this embodiment, the DEPs are the customizing data servers and the devices that deliver customizing data.   The management interface[5] is the computer PC, clearly delineated by the circle (highlighted in red) which receives the customizing data requests and delivers the requests to the DEPs, and, in turn, receives back the customizing data from the DEPs and sends the customizing data back to the customizing stations.  *See also*, Ex. 2.[6]  The customizing machine is MP1 (highlighted in blue).   The customizing stations are PP1-PP6 (highlighted in yellow).   The management interface connects to both the customizing machines/stations and to the data servers/devices (highlighted in purple) via links[7] (highlighted in green). The management interface receives the requests for customizing data from the customizing stations and transmits requests for customizing data to the server and then receives the corresponding response back from the server and transmits that response back to the customizing station.  It only makes logical sense for the <u>corresponding response</u> to be <u>customizing data</u> pertinent to the request for customizing data, even if the responsive data is also encrypting data.  This is a clearly reasonable interpretation of Fig. 1 and is supported by the specification (*see infra,* § VII).

---

[5] In this embodiment, "[t]his management interface comprises: a computer equipped with a multiway card, …." Ex. 1 at 2:49-50.  "Management interface" is a disputed claim term.  CPI has elected not to brief this term, and so the parties will propose constructions for this term in the JCCC.

[6] In this Response, exhibits cited are to the concurrently filed Declaration of Tammy J. Dunn in support of Gemalto's Response to CPI's Opening Claim Construction Brief.

[7] The term "link" is also a disputed claim term.  CPI has elected not to brief this term as well, and so the parties will also propose constructions for this term in the JCCC.

III.     **CLAIM CONSTRUCTION AND INDEFINITENESS**

Claim construction and indefiniteness are intertwined, but the indefiniteness inquiry is determined by the claims as a whole, not by isolated claim terms. *Cox Communs., Inc. v. Sprint Commun. Co. LP*, 838 F.3d 1224, 1231-32 (Fed. Cir. 2016). "[C]ourts should determine on a claim-by-claim basis whether to analyze indefiniteness as part of claim construction or at a later point." *DataTern, Inc. v. MicroStrategy, Inc.,* 2017 U.S. Dist. LEXIS 44427, *13 (D. Mass. 2017). "[T]he Federal Circuit's statements that indefiniteness is intertwined with claim construction mean only that the Court must attempt to determine what a claim means before it can determine whether the claim is invalid for indefiniteness, and not that the Court must determine indefiniteness during the claim construction proceedings." *ASM Am., Inc. v. Genus, Inc.*, 260 F. Supp. 2d 827, 831 (N.D. Cal. 2002). The alleged infringer must show by clear and convincing evidence that no reasonable claim term construction can be made.

The Supreme Court has articulated a "reasonable certainty" standard under which, after first attempting to determine what the claim terms mean, the court should analyze indefiniteness: whether "a skilled artisan would understand with reasonable certainty the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.,* 134 S. Ct. 2120 (2014). Since *Nautilus*, the Federal Circuit has rarely upheld a district court's finding of indefiniteness. As the Federal Circuit has also noted, in viewing claims in light of the specification, the specification need not be a "model of clarity" to find claims to be definite. *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1321 (Fed. Cir. 2008)

CPI has not proven the claims here are indefinite under 35 U.S.C. § 112, ¶2.

## IV.    PERSON OF ORDINARY SKILL IN THE ART

A POSITA at the time of the invention would have had a Bachelor degree in computer science, computer engineering, or a related field of study to include courses in computer architecture, smart cards, and data transmission, and/or sufficient industry experience to have had a working knowledge of computer architecture, smart cards, and data transmission.    For claim construction purposes and in an analysis of indefiniteness, a POSITA refers to a person with these qualifications.

## V.     THE PROBLEM SOLVED BY THE INVENTION

While everyone agrees the problem overcome by the patented invention is, in general, data traffic jams, CPI misinterprets the solution as being the mandatory exclusion and complete separation of "encrypting data" and "customizing data" from each other.   The patent actually has two distinct aims:   (1) "improving the data exchange flows between the customizing lines or appliances and the peripheral encrypting devices," Ex. 1 at 1:53-57, and (2) "optimis[ing] the response time of a data server *vis-a-vis* a request from a customizing station," Ex. 1 at 2:9-11.   CPI focuses solely on the first aim, not even mentioning the second.   "When the specification sets out two different problems present in the prior art, it is unnecessary for each and every claim in the patent to address both problems."   *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1367 (Fed. Cir. 2009).   Even in the unlikely event, therefore, that CPI could be correct with regard to solving the first problem, it has failed to assert that the claims do not solve the second problem.   They need not solve both. In this regard alone, CPI has failed to prove indefiniteness, and the Court should so find.

But even for the prior art problem on which CPI focuses, CPI is wrong in its analysis of the invention's solution and the scope of the claims. CPI says that encrypting data and customizing data <u>must</u> be two separate things in two separate places and, as such, the data server <u>must</u> be limited in its <u>function</u> – that because the data server described in the specification sends encrypting data, it cannot also send customizing data, and thus a data server that sends customizing data does not exist. <u>These are fundamental errors</u>, and the bases for CPI's entire indefiniteness argument. A close look at the terms reveals why CPI's indefiniteness argument must be rejected.

## VI.   ESTABLISHED MEANINGS OF THE CLAIM TERMS

### A.   *The words in the claim terms have established meanings in the art.*

CPI alleges that "the two 'data server' terms are indefinite" because "there is no direction from the relevant field, the patent, the file history, or even the inventor" as to what these terms mean. CPI's Opening Brief, Dkt. 80, p. 2. To the contrary.

To start, the field is the personalization of smart cards. Smart cards came about in the late 1960s and early 1970s. The year 1974 saw the first patent application for memory in an integrated circuit card (later dubbed the "smart card"). The integrated circuit (or microcircuit)[8] contains unique secure personalized data. It was well known in the prior art that "data servers" are devices that, in one way or another, do something with (*i.e.,* "serve") data.[9] The terms "customizing" and "encrypting" are also not new to this invention and can be given their ordinary meanings. In the case of data that goes

---

[8] The parties have agreed that the term "smart card" should be construed as "a card that contains a microcircuit." Dkt. 56, p. 1.

[9] Curiously, CPI has no trouble construing "data server" in its Petition for *Inter Partes* Review attached to its Motion to Stay Litigation (Dkt. 78:A, p. 10), in which CPI construes "data server" as "a device providing data."

on a smart card, the data is called "customizing data" because the smart card is "customized" or "personalized" with certain data so that each individual user has a secure smart card unique to all other smart cards. "Customizing" is merely a common modifying word used to connote the data particular to a financial institution and card user—the data that goes on a customized (or personalized) smart card. <u>All</u> of the data in the memory of the microcircuit card is "customizing data."[10]

Additionally, at Dkt. 78:A, p 6, CPI construes "customizing station" as "one or more devices for <u>customizing</u> a smart card." While "customizing station" is not in dispute for claim construction purposes, CPI's use of "customizing" in its own proposed IPR construction shows that CPI believes a POSITA would understand "customizing" data refers to <u>any</u> data that goes on a smart card. If "customizing" data cannot include "encrypting" data, how would the encrypted data get onto the smart card? The only way

---

[10] "Customizing" and "personalizing" are used interchangeably in the smart card industry. "Encrypting" is merely a part of customization or personalization. If indeed a dispute exists as to the types of customization data that goes on a smart card and which of that data is or is not encrypted, and if those various types of data are relevant, then clearly an underlying question of fact exists between the parties and a determination of invalidity in any form is not proper at this juncture. Suffice it to say that the smart card chip contains both encrypted and non-encrypted data including application programs, public keys, private keys, algorithms, file structures, user info, institution info, credit and value limits, and other data. *See, e.g.,* Ex.3, U.S. Patent 6367011 B1, titled <u>Personalization of Smart Cards</u>, filed Oct. 13, 1998, with a priority date of Oct. 14, 1997 (The Background of the Invention gives a broad overview of smart card customization in the prior art). All data on a smart card is "customizing" data, whether encrypted or not. *See also, e.g.,* Ex. 4, WO 97/39424, "Tushie Patent," submitted as prior art in the '418 Patent application. Language in prior art can evidence definiteness if one skilled in the art could have understood the term in the context of the invention. *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F. 2d 1540, 1555 (Fed. Cir. 1983). The point is that "encrypting data" has always been considered to be "customizing data," and the '418 Patent does not define these terms any differently.

it can is via something that does "customizing."  The word "customizing" must be used

consistently.  It cannot include encrypting data in one instance but not in another.

**B.**   ***The '418 Patent's summary of smart card "customization" is
reasonably understood in the art.***

Because these terms are so well known, the patentee did not need to give

definitions. Nor did he change the established definitions. He did, though, summarize

"customization" and specifically included data from a data and calculation file:

> According to the usage of the card, it is necessary to **record data issuing
> from a data and calculation file** in the memory of a microcircuit, notably
> a chip with or without a microprocessor.  These operations are called
> **"customization**" of the microcircuit card and are carried out by a
> customizing machine.

Ex. 1 at 1:15-20 (emphasis added).  To make the smart card secure, the data issuing

from the calculation file and then recorded on a microcircuit card is "encrypting data."

Thus, the patent itself intends for "customizing" to encompass "encrypting."

The Background of the Invention further provides that customizing data comes

from peripheral devices:[11]   "The **customized data** of each card are supplied to the

reader/encoder by a peripheral device."  Ex. 1 1:28-29 (emphasis added).  These are

the same peripheral devicesCPI now says can and must deliver only encrypting data.

CPI's conclusory statement that "the 'data server' described in the specification supplies

*only* encrypting data" (Dkt. 80, p 3, emphasis in original) is simply not supported.

The '418 Patent identifies transportation keys, a session key, and certificates that

authorize the creation of a directory or file as being transmitted back and forth between

the customizing appliance and the peripheral device, thus causing a high rate of data

---

[11] A "device" can be a "data server." A "data server" is a "device."  Again, CPI has
combined the terms "data server" and "device" in its arguments.  *See* fn. 1.

exchanges.   All three types of data go back and forth between the customizing appliance and the peripheral device.   It is at least these same three types of data for which the management interface of the present invention is needed to manage the data exchanges.   However, the only type of data identified in the specification as being encrypted is the certificate.  Ex. 1 at 1:31-43.  Using CPI's argument that the patent can *only* be read to allow "*only*" encrypted data to be sent to and from the data server would mean the only piece of data that could be sent to and from the data server is the certificate.  Again, that simply cannot be correct.

Because no other data is identified as being encrypted, under CPI's exclusion/separation argument, the transportation and session keys would then remain as "customizing data," making them unavailable to the data server that delivers the certificate.   CPI's interpretation is implausible and would be seen as unrealistic to a POSITA reading the patent.  It is the certificate, not alone, but <u>along with</u> at least the transportation keys and the session key, that caused the high exchange of data in the prior art, for which the patentee found a solution in the architecture of the management interface.  Ex. 1 at 1:40-44.  The data either going to or coming back from the data server includes *all three* security features, some of which may or may not be encrypted.

## C.   *Other patent claims also support the clear meaning of the terms.*

Other patent claims support Gemalto's point.  In dependent claims 8 and 16, the control device delivers "**additional**" customizing data.  If "customizing data" excluded encrypted data, there would be no need for the word "additional" in this context.  The requirement that the data server send encrypting data is a limitation of only claim 15,

further indicating that "customizing data" from the data server of claim 13 (a broader claim than claim 15) may include more than "encrypting data."

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term." *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014). The patentee did neither here. Neither the specification nor the file history show any instance where the patentee clearly defined these terms in a manner inconsistent with their ordinary and established meanings.[12] "Customizing data" includes <u>any</u> of the data that personalizes a smart card. Because the patentee used the words as established in the art, the Court need do no more than apply these widely accepted meanings and adopt Gemalto's proposed claim constructions.

## VII. THE SPECIFICATION

### A. *These terms are not means-plus-function terms and are not limited by structure described in the specification.*

CPI has not asserted in its Opening Brief that these terms are means-plus-function terms under pre-AIA 35 U.S.C. § 112 ¶ 6[13], yet CPI has framed its argument as though the structure in the terms must be defined by what it does (or, rather, by the type of data *CPI says* it can or cannot send). These claim terms are not means-plus-function terms – yet another reason why the claim terms need not be limited by the structure described in the specification. A claim term that does not use the word "means" creates

---

[12] While Gemalto recognizes that CPI may change its construction, in the only JCCC filed to date, CPI advocated that the term "plurality of devices that deliver customizing data" should be given its plain and ordinary meaning. Dkt. 56, p. 32.

[13] Post-AIA 35 U.S.C. § 112(f).

the presumption that § 112 ¶ 6 does not apply.  *Phillips v. AWH Corp.,* 415 F.3d 1303,

1310 (Fed. Cir. 2005) *(en banc)*.  "The standard is whether the words of the claim are

understood by persons of ordinary skill in the art to have a sufficiently definite meaning

as the name for structure."  *Williamson v. Citrix Online, LLC,* 792 F.3d 1339, 1348 (Fed.

Cir. 2015) (*en banc*).  A POSITA knows what the words <u>encrypting</u>, <u>customizing</u>, <u>data</u>,

and <u>data server</u> mean in the context of smart card personalization.

> **B.**    ***The specification provides support for "customizing data server"
> and "devices that deliver customizing data."***

By making "encrypting data" and "customizing data" two distinct types of data,

CPI embarks on a long and misguided path arguing that there is no "customizing data

server" because the data coming from the server *must* be encrypted and, more

significantly, *cannot be* customizing.  In a nutshell, CPI's argument is:  Encrypting data

is not customizing data, CPI's *newly defined* "customizing data" cannot leave CPI's

*newly invented* "customization side," no "customizing data" can come from CPI's *newly

invented* "encryption side," and thus there is no customizing data server.  CPI is wrong

in both its assumptions and its conclusions.

Oddly, though, CPI argues that "there is no 'customizing data server' anywhere in

the specification" … except where it is.  Claim 1 in fact reads <u>exactly on</u> the

specification.  No guessing or interpretation is required as to what is the invention.

> The invention concerns a smart card customizing system characterised in
>     that it comprises:  . . .
> **at least one customizing data server delivering customizing data;**
> at least one management interface connected on the one hand to at least
>     one of the said customizing machines and on the other hand to at least
>     one of the **said data servers** by a bi-directional link, the said
>     management interface receiving the said requests, transmitting them to
>     at least one of the **said servers**, receiving the corresponding response
>     and transmitting it to the requesting customizing station,

> characterised in that the said management interface is able to manage the
> transmission of the applications/requests or customizing data
> requirements to at least one of the **said servers** as soon as they are
> received and as soon as the **said server** is available.

Ex. 1 at 2:17-36 (emphasis added). The specification clearly states that the invention

includes a customizing data server that delivers customizing data. CPI seems to

suggest that either (1) the same wording cannot be used in both a claim and in the

specification or (2) that a claim term must be mentioned more than once in the

specification in order for the claim term to be valid. That is not the law. If CPI is

suggesting that the description in the specification is insufficient, that issue is proper

only with an invalidity assertion under pre-AIA 35 U.S.C. § 112 ¶1 (post-AIA § 112(a))

and is a question of fact for the jury, not a question of law for the Court. *Enzo Biochem,*

*Inc. v. Gen-Probe Inc.,* 323 F.3d 956, 962-63 (Fed. Cir. 2002).

### C.      *Claim terms are not limited to a single embodiment.*

Only in rare cases are claim terms limited to the embodiment disclosed in the

specification. *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.* 214 F.3d 1302 (Fed.

Cir. 2000); *see also GE Lighting Solutions* 750 F.3d at 1308 (claim construction proper

even though it excluded the only embodiment disclosed in the specification). "That a

specification describes only one embodiment does not require that each claim be limited

to that one embodiment." *SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107,

1121 n.14 (Fed. Cir. 1985). This is hornbook patent law learned in Patents 101.

### D.      *Figure 1 is a single example embodiment only.*

Similarly, "patent coverage is not limited to embodiments that look like the ones

in the figures. *See, e.g., Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d

1246, 1254 (Fed. Cir. 2011); *Gart v. Logitech, Inc.* 254 F.3d 1334, 1342 (Fed. Cir. 2001)

("drawings are not meant to represent the invention or to limit the scope … defined by the <u>words used in the claims</u> themselves") (emphasis added)."[14]   CPI's complete reliance on Figure 1 as limiting the scope of the claims is fundamentally wrong.

> **If everything in the specification were required to be read into the claims, or if structural claims were to be limited to devices operated precisely as a specification described embodiment is operated, there would be no need for claims. Nor could an applicant, regardless of the prior art, claim more broadly than that embodiment.** Nor would a basis remain for the statutory necessity that an applicant conclude his specification with "claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

*SRI Int'l* at 1121 (emphasis added).  Indeed, the '418 Patent itself states:

> [T]**he following description of a particular example embodiment, the said description being given in relation to the accompanying drawing,** in which: FIG. 1 is a functional diagram of a smart card customizing system according to the invention, …

Ex. 1 at 3:26-31 (emphasis added).  Use of "for example" in a patent specification indicates the claim term should not be given a restrictive interpretation.  The claim term may have a broader interpretation.  So, even if CPI could somehow possibly be correct (which it isn't) that a "customizing data server" or "device that delivers customizing data" is not present in what CPI terms the "encrypting side" of Figure 1 or in one embodiment, the claims would still not be so limited by the figure.

## VIII.   THE FILE HISTORY

### A.   *The inventor did not disavow the full scope of the claim terms.*

Indeed, the examiner never asked for a definition of these terms in any discussion of the invention.  Many times during prosecution of the patent, the patentee

---

[14] Strand, P., "'*Cardinal Sin'--The Solution (Part II) Limiting Limitations In Claim Construction*", <u>IpQ Enhancing Your IP IQ</u>, Vol. III, No.10, October 2011.

used the terms "customizing data server," "devices which deliver the customizing data,"
or ones indicating that customizing data came from such devices or servers.

This term in claim 1, filed initially as "at least one customizing data server (SD)
delivering customizing data," was amended in the Preliminary Amendment to read "at
least one customizing data server that delivers customizing data."   The patentee
purposefully deleted the "(SD)" designation referring to Fig. 1.    Ex. 5 at
GEMALTO00000350 (Preliminary Amendment, May 7, 2001).  In initially rejecting claim
1 under U.S.C. §103 (a), the examiner referred to the claimed data server as
corresponding to the reports 154 of the Tushie patent.   *Id.* at GEMALTO00000529
(Office Action, Oct. 18, 2002).  The patentee responded:

> There is no disclosure that the card issuer management system interface
> 101 of the Tushie patent operates in the same manner. In particular, there
> is no disclosure that data presented by the reports 154 are received at the
> card issuer management system interface 101, and transmitted to the card
> issuer management system 150.  Rather, as illustrated in Figure 154, the
> information in the reports is communicated directly to the card issuer
> management system 150.   Further in this regard, the Tushie patent
> describes the function of the reporting capability 154 is "so that the card
> issuer can review statistical information maintained by the system 100." In
> other words, the reporting capability 154 is a "user" interface that enables
> the card issuer to review data. As such, there would be no reason for the
> card issuer management system interface 101 to receive this data.

*Id.* at GEMALTO00000534 (Amendment March 24, 2003).  The examiner made no
further issue about the meaning or the structure of the data server.

Further uses of the data server terms by the patentee and by the examiner were
only mentioned in a discussion of the management interface.  For example:

> As discussed in the background portion of the application, the present
> invention is concerned with management of the data exchanges that occur
> between customizing appliances and **devices which deliver the
> customizing data.**

Ex. 5 at GEMALTO00000502 (Amendment July 24, 2002) (emphasis added). The purpose of the management interface is to manage the exchanges of requests for customizing data and the data received in response to each request.

> The management interface […] operates to **receive requests for customizing data** from the customizing machine and **transmit them** to an available server upon receipt, as well as to receive **the corresponding responses** from the server and transmit them to the requesting customizing machine.

*Id.* at GEMALTO00000533 (Amendment March 24, 2003) (emphasis added).

> Goman fails to disclose that the card issuer management system … **receives customizing requests** from the personalization stations and **transmits them to the personalization server** as claimed.

*Id.* at GEMALTO00000561 (Amendment, December 9, 2003) (emphasis added).

> Independent claim 13 defines a smart card customizing system that includes, *inter alia,* … **a plurality of devices that deliver customizing data**; … and to **transmit customizing data delivered by said devices** in response to said requests to the requesting customizing stations.

*Id.* (emphasis added).

> Another feature of the invention recited in claims 9-17 is that a plurality of customizing stations and/or **a plurality of devices that deliver customizing data are each connected to the management interface,** via respective data links.

*Id.* at GEMALTO00000535 (Amendment dated March 24, 2003) (emphasis added).

Further, in referring to claim 13,

> [T]he management interface is responsive to requests received from the customizing stations to deliver them to an available one of the data delivery devices, and **to transmit customizing data delivered by the devices to the requesting customizing stations.**

*Id.* (emphasis added). And by the examiner:

> Hence Goman teaches … a server 100 (**customizing data server that delivers customizing data**), ….

*Id.* at GEMALTO00000550 (Office Action June 9, 2003) (emphasis added).  References to "customizing data servers" or "devices that deliver customizing data" were used repeatedly in the file history; always with the widely accepted uses of the term in the art.

**B.   *The examiner used the terms, but never rejected them under § 112.***

Not once did the examiner raise the issue or reject <u>any term</u> of the patent under U.S.C. § 112, when she had ample opportunity to do so.  Instead she used the terms repeatedly, and ultimately referred to the "server" in the allowance of the claims.  Had the examiner thought the terms were indefinite, she would have said so and not allowed the '418 patent to issue.  *See, e.g., Alifax Holding Spa v. Alcor Sci. Inc.*, 2017 U.S. Dist. LEXIS 63859 (D.R.I. Apr. 27, 2017).

**IX.   INVENTOR TESTIMONY**

**A.   *Inventor testimony has no probative value.***

CPI's reliance on inventor testimony is not proper. "The subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim (except as documented in the prosecution history)." *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979, 985 (Fed. Cir. 1995) (*en banc), aff'd, Markman*, 517 U.S. 370.  "Markman requires us to give no deference to the testimony of the inventor about the meaning of the claims." *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1346 (Fed. Cir. 2008).  **"It is particularly inappropriate to consider inventor testimony obtained in the context of litigation in assessing validity under section 112, paragraph 2, in view of the absence of probative value of such testimony."** *Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372, 1379 (Fed. Cir. 2000) (emphasis added).  "Whether an inventor's testimony is

consistent with a broader or narrower claim scope, that testimony is still limited by the fact that an inventor understands the invention but may not understand the claims, which are typically drafted by the attorney prosecuting the patent application." *Howmedica,* 540 F.3d at 1346.

The patent uses the term "customizing data" to have the same meaning as accepted in the art and so encompasses more than encrypting data.  "As one treatise on patent drafting explains, it is the claim drafters job to have written the claims in the application to not only cover what they [*sic*] attorney and the inventor/client could at the time of the application prosecution have envisioned as competing products, but to cover competitive products which neither the inventor nor the attorney thought of or could even have imagined at the time . . ."  *Daiichi Pharm. Co. v. Apotex, Inc.*, 380 F. Supp. 2d 478, 487, fn 8 (D.N.J. Aug. 5, 2005) (*citing* Robert C. Faber, Landis on Mechanics of Patent Claim Drafting § 10:1-1 (5th ed. 2004)).  So, even if Mr. Maurel envisioned that the peripheral devices sent *only* encrypting data (and there is no indication that he did), that would not invalidate claims using "customizing data" and "customizing data server."

### B.   *CPI misconstrues Mr. Maurel's testimony.*

In any event, along with improperly relying on inventor testimony in general, CPI also draws improper conclusions from Mr. Maurel's testimony.

**1.   No distinction between encrypting and customizing data.**  First, CPI takes Mr. Maurel's testimony, "it [the data server] should be securely kept" (Dkt. 80, p. 3), to mean that "the customizing data never leaves [what CPI terms] the customization side."  *Id.*  Even if Mr. Maurel's testimony was relevant (which it is not), what Mr. Maurel said was: "I think it is more secure to have the actual cryptographic

device in a computer room." Ex. 6 (Maurel Depo. Tr.) at 48:23-24. "And we believe it's better than on the machine you have a minimum of information; everything should be centralized somewhere. So it was better for that. **It was not a requirement,** I think, but it was better." Ex. 6 at 49:12-16 (emphasis added).

Mr. Maurel did not ever testify that encrypting data was not customizing data, or that the data server that transmitted encrypting data could not transmit customizing data, or that there was a "customization side" and an "encrypting side," or that "customizing data" was required to stay within the "customizing machine." That's not the invention. Nor did CPI's counsel ever question Mr. Maurel to that effect. Mr. Maurel's deposition transcript reveals no instances of "customizing data," "customizing data server", "encrypting data," or "encrypting data server" by either Mr. Maurel or CPI's counsel. If CPI wanted Mr. Maurel to testify that encrypting data was not customizing data, its counsel should have asked Mr. Maurel that directly, rather than misconstruing Mr. Maurel's words to fit its theory.

        **2.**    **Comparison of figures.** CPI also takes an unwarranted leap with its second quote of Mr. Maurel. Mr. Bloch asked Mr. Maurel to compare two figures – one from the invention disclosure to one from the issued patent. First, a comparison between those figures is in no way relevant to whether a claim term is indefinite. Figures, specifications, and claims change all the time between the filing of an invention disclosure and the issuance of a patent. Second, CPI says that, because Mr. Maurel acknowledged that the two figures are different, Mr. Maurel therefore couldn't recognize his invention. Again, CPI misconstrues Mr. Maurel's testimony. Understanding that

"Exhibit 5" in the deposition is the invention disclosure and "Exhibit 10" (and Figure 1 thereof) is the French patent application, Mr. Maurel's testified:

> A: Yes, [Figure 1] is a transcription of what I discussed [with an in-house attorney at Gemalto]. Yes.

Ex. 6 at 88:18-19.

> A: I need to check again. But in this Exhibit 5, I think it's more a state of the art, what we had with the keys, what we had with Banksys. It was -- it seems to be an older document.

*Id.* at 90:3-7.  In no way did Mr. Maurel testify that he didn't recognize his invention.

       **3.**    **Specific technology.**  The focus is on what a skilled artisan would have understood the claims to mean, not on what the patentee actually did during testing.  *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312 (Fed. Cir. Aug. 7, 2015).  Mr. Maurel's testimony regarding "the connection of … the DEP to the Datacard 9000" (Ex. 6 at 20:5-7), and other testimony as to specific hardware or software or other specific technology or manufacturers in use at the time of his invention is irrelevant. The claims here are not in any way limited to specific manufacturers of computer components at the time of the invention.  Nor are inventors expected to see all possible embodiments of an invention or not-yet-developed technologies.

      **C.**    ***CPI has not designated Mr. Maurel as an expert witness and so his testimony is not admissible on the issue of indefiniteness.***

CPI relies on *Two Moms & a Toy, LLC v. Int'l Playthings, LLC,* 2012 U.S. Dist. LEXIS 150805 (D. Colo. Oct. 19, 2012) to argue that Mr. Maruel's testimony should be allowed because an inventor qualifies as a POSITA.  However, the question of whether a specific person (including an inventor) is a POSITA is different from whether the

person may offer <u>expert</u> testimony.   In *Two Moms*, Judge Brimmer found the inventor "could ultimately qualify" as a POSITA based on her experience, but did not allow her testimony because Two Moms had failed to timely designate her as an expert. *Id.* at 7. CPI has not designated Mr. Maurel, or anybody else, as an expert in this case.

It is CPI's burden to show that a POSITA would be unable to find a reasonable construction for the claim terms.   CPI has failed to do so.   An inventor may testify <u>only</u> as to <u>personal knowledge of the facts, not make comparisons between documents or figures that a lawyer wrote</u>.   *See Verizon Services Corp. v. Cox Fibernet Virginia,* 602 F.3d 1325 (Fed. Cir. 2010) (inventor testimony that strays away from first-hand experience of what the inventor actually did, and testimony on an invalidity issue for which the inventor has not been qualified as an expert, is not allowed).

In *Hand Held Products v. Amazon.com, Inc.*, 2014 U.S. Dist. LEXIS 85345, at *48-49 (D. Del. June 24, 2014), the district court found the defendant had failed to show that certain claim terms were indefinite, noting that the defendant had provided "no expert testimony in support of its indefiniteness argument."   Id. at 48-49.   CPI has provided no expert testimony to support its indefiniteness argument.

In *Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.,* 14 F. Supp. 3d 588 (D. Del. 2014), the court noted that "it does not appear that Mr. Auriol took the Court's construction into account…."   *Id.* at 591.   The court in that case had already construed the claims.   Denying summary judgment on those grounds cannot be used as precedent to support a finding of indefiniteness here at the claim construction stage. *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.,* 2007 U.S. Dist. LEXIS 97658 (D. Md. June 22, 2007) is distinguishable.   The court found the claim term in that case to be

indefinite because the limitation was construed in terms of the result obtained from practicing the invention.   In other words, a person would either not know he had practiced the invention until after the fact, or would not know how to repeat the invention.  That is not the situation with the claim terms here.

## X.     CONCLUSION

For the foregoing reasons, Gemalto respectfully requests the Court construe the claim terms as Gemalto proposes and hold the claims not indefinite under 35 U.S.C. § 112, ¶2.

Dated:  June 1, 2017

OSHA LIANG LLP

*s/ Peter C. Schechter*
Peter C. Schechter, Esq.
Tammy J. Dunn, Esq.
Monica M. Moussighi, Esq.
909 Fannin Street, Suite 3500
Houston, TX 77010
Tel | Fax: (713) 228-8600 | (713) 228-8778
Email:  Schechter@OshaLiang.com
          Dunn@OshaLiang.com
          Moussighi@OshaLiang.com

LEWIS ROCA ROTHGERBER CHRISTIE LLP

*s/ Kris J. Kostolansky*
Kris J. Kostolansky, Esq.
Adam L. Massaro, Esq.
1200 17th Street, Suite 3000
Denver, Colorado 80202
Tel | Fax: (303) 623-9000 | (303) 623-9222
Email:  kkosto@lrrc.com and
          amassaro@lrrc.com

*Attorneys for Plaintiff Gemalto S.A.*

101455134_1

## CERTIFICATION OF COMPLIANCE

Counsel of Record hereby certifies that pursuant to D.C.Colo.LPtR 17, GEMALTO'S RESPONSE TO CPI'S OPENING CLAIM CONSTRUCTION BRIEF contains approximately 6,443 words, which is less than the 10,000 total words permitted by the Court's rules. Counsel relies on the word count of the computer software used to prepare this Response. This Response uses Arial 12-pt. font in accordance with the Court's rules.

Date: June 1, 2017

*s/ Kris J. Kostolansky*
Kris J. Kostolansky, Esq.

## CERTIFICATE OF SERVICE

I hereby certify that on the 1ST day of June, 2017, I served via electronic mail to all counsel of record the foregoing GEMALTO'S RESPONSE TO CPI'S OPENING CLAIM CONSTRUCTION BRIEF.

*s/ Kris J. Kostolansky*
Kris J. Kostolansky, Esq.