IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-01006-RBJ

GEMALTO S.A.,

    Plaintiff,

v.

CPI CARD GROUP INC.,

    Defendant.

---

**CPI CARD GROUP INC.'S REPLY IN SUPPORT OF ITS
OPENING CLAIM CONSTRUCTION BRIEF**

---

As used in the `418 patent, the phrases "customizing data server" and "devices that deliver customizing data" are indefinite, because the patent's specification sets no limits and provides no definition of these words, and standing alone they are not sufficiently clear to guide a person of skill in the art. Gemalto's only response is to conflate "customizing" with "encrypting," thus reading one or the other out of the claims.

It is Gemalto, not CPI, who "embarks on a long and misguided [21-page] path arguing that" the `418 patent is not indefinite because somehow "[a]ll data on a smart card is 'customizing' data, whether encrypted or not." ECF No. 82 at 7, 11. This is a fatal admission: if "customizing data" and "encrypting data" are the same thing, Gemalto either has to acknowledge that there is no written description support or enabling disclosure for its claims, re-draw the figures and re-write the specification to preserve its patent, or admit that the figures and specification actually teach away from the claim

language. Choosing the first of these bad options, Gemalto argues that "customizing data" is the same as "encrypting data," so any device that delivers the latter necessarily delivers the former. That is simply incorrect, in view of the patent itself (which never identifies the "customizing data server") and the inventor's own testimony (which distinguishes repeatedly between customizing and encryption). Post-hoc attorney argument cannot save this patent from an indefiniteness finding. *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371-74 (Fed. Cir. 2014) (emphasizing *Nautilus*'s disapproval of "'post hoc' efforts to ascribe *some* meaning to a patent's claims'") (emphasis original) (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2130 (2014)).

I. **GEMALTO HAS "RE-DRAWN" THE FIGURES, "RE-WRITTEN" THE SPECIFICATION, AND "RE-DRAFTED" THE CLAIMS TO AVOID AN INDEFINITENESS FINDING**

   A. **None of the actual figures in the '418 patent disclose a "customizing data server"**

Figure 1 of the `418 patent is "a functional diagram of a smart card customizing system according to the invention." ECF No. 1-1 (`418 pat.) ("'418 pat.") at 3:30-31. Each item in Figure 1 is specifically labeled and defined in the specification. *Id.* at 3:35-4:23. But because none of those labels identify a "customizing data servers" or a "device that deliver customizing data," Gemalto relabels Figure 1 for purposes of claim construction (from ECF No. 82 at 2):



The problem is, the two purple devices Gemalto identifies as "customizing data servers" or "devices that deliver customizing data," DEP1 and DEP2, are very clearly defined in the specification as "Data **Encryption** Peripheral[s]." `418 pat. 4:5-7 (emphasis added). There is no mention of "customization" by these peripherals and, as discussed in CPI's opening brief (and below), the patent intends the two types of data— encryption and customization—to be segregated:

> using an architecture for communication between the customizing appliances or lines and the peripheral devices in which **on the one hand** the customizing lines receive ***customizing data*** through a communication [bus] and **on the other hand** a data server supplies the ***encrypting data*** to the customizing lines by means of computer links, the encrypting data being supplied by peripheral encrypting devices via computer links.

*Id.* at 1:58-65; *see also id.* at Abstract. Logically, it cannot be the case that the "customizing lines" receive both "customizing data" and "encrypting data" from the same source, not least because customizing data is said to come through a "communication bus" and encrypting data comes instead though "peripheral encrypting devices via

-3-

computer links." The specification does not describe the "customizing data server" anywhere; the phrase crops up for the first and only time in claim 1, and likewise "devices that deliver customizing data" appear for the first and only time in claim 13. Neither term is defined anywhere in the `418 patent. Gemalto's artwork cannot solve the problem now.

Gemalto also suggests, ECF No. 82 at 2, that the two phrases should be given different meanings. But it identifies them as the same DEPs in Figure 1, and it concedes that neither phrase appears in the patent.

And despite Gemalto's assertion, CPI is entitled to request a determination that these phrases are indefinite *now*. Numerous Federal Circuit cases have upheld indefiniteness findings for specific claim terms.[1] The single out-of-circuit district court case on which Gemalto relies deals instead with "whether a party *per se* waives timely-

---

[1] *E.g., Icon Health & Fitness, Inc. v. Polar Electro Oy*, 656 F. App'x 1008, 1015-16 (Fed. Cir. 2016) (the "ambiguous nature of the distinction between" the claim terms "in-band" and "out-of-band" rendered them incapable of construction where the terms "only have meaning in a given context with a defined reference"); *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371-74 (Fed. Cir. 2014) ("unobtrusive manner" is indefinite because it was a "purely subjective" phrase as to which the claims lacked "objective boundaries" and the specification lacked "sufficient guidance"); *Trusted Knight Corp. v. Int'l Bus. Machines Corp.*, No. 2016-1510, 2017 WL 899890, at *4 (Fed. Cir. Mar. 7, 2017) (internal quotation omitted) ("in response to the software key logging" is indefinite because after reviewing the intrinsic evidence the court found that the term failed to "apprise the public of what is still open to them"); *Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*, 803 F.3d 620, 633-35 (Fed. Cir. 2015) ("slope of strain hardening coefficient" is indefinite because four different methods existed for measuring the coefficient and the patent did not discuss the methods nor "provide guidance" as to which one should be used), *cert. denied*, 136 S. Ct. 2452 (2016); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341-45 (Fed. Cir. 2015) ("molecular weight" is indefinite because it could be calculated using several different methods; the claims "offer[ed] no guidance" as to what the term covered; and the specification "never define[d]" the term or mentioned the different methods).

filed indefiniteness contentions with respect to terms that it did not nominate for claim construction." *DataTern, Inc. v. MicroStrategy, Inc.*, No. 11-11970-FDS, 2017 U.S. Dist. LEXIS 44427 *13 (D. Mass. Mar. 27, 2017) (emphasis original).  Here, however, CPI properly identified "customizing data server" and "devices for customizing data" as indefinite during the claim construction process.  This is thus a proper time for the Court to determine that the "customizing data server" phrases are indefinite.

### B. The specification does not equate the customizing data server and the encryption peripherals

Gemalto, in an effort to save the claims, has latched onto the "encryption peripherals" as the claimed customizing data servers.  Gemalto's position is that, if all encryption data is customizing data (*id.* at 7, 11), then any server (or other peripheral, apparently) that stores encryption data necessarily also stores customization data.  But if Gemalto is right, then there is no distinction between customizing machines (MP1 … MP4 in Figure 1) and peripheral encrypting devices (DEP1 … DEP6 in Figure 1); and hence the patent cannot "improv[e] the data exchange flows between the customizing lines or appliances and the peripheral encrypting devices" nor reduce "the risk of a request to a data sever from two or more customizing stations at the same time when another data server is available." `418 pat. at 1:55-7, 2:5-7.

Gemalto admits that the specification is not "a model of clarity," ECF No. 82 at 4, but in this instance it is reasonably clear.  It explicitly separates the two different types of data addressed by the alleged invention: encrypted and customizing, with no overlap between the two: "a serial type computer connection of the multi-port card … transmits cryptographic data of peripheral devices," while "[t]he customizing data is supplied by a

control device via a communication bus." `418 pat. at Abstract, 1:58-65.  The patent identifies them both (as Gemalto concedes) as being known in the prior art—their simultaneous transfer over the same communication bus at the same time was the reason data transfer at that time was slow.[2]  *Id.* at 1:58-2:2.  Despite Gemalto's argument that the patent suggests two different approaches to address this alleged problem, ECF No. 82 at 5, the solutions offered by the patent all involve controlling (somehow) the flow of *different kinds of information* between *different devices* communicating through *different types* of hardwired computer connection.  That Gemalto claims to have invented a "management interface" to direct this computer traffic tells us nothing about what the "customizing data server" *is*.

     Gemalto is also wrong to argue that the architecture responsible for transmitting the two different types of data (customizing and encrypting) are not implicated by the claims.  One only has to look at claims 8 and 17: both disclose additional devices that supply "additional customizing data" via a "communication bus" or "means separate from said serial links."  Thus, all claims envision at least two data sources, and some dependent claims envision more than that.

     Gemalto's assertion that "***CPI*** says that encrypting data and customizing data must be two separate things in two separate places" is only half right.  ECF No. 82 at 6.  CPI does say this—but only because the patent said it first.  As the Court already has found, the `418 patent's "second claimed advance came by separating out the

---

[2] Gemalto offers two contradictory definitions of "customizing data": [1] "**[a]ll** of the data in the memory of the microcircuit card," Dkt. 82 at 7, and [2] "**any** of the data that personalizes a smart card," *id.* at 10 (emphases added).

transmission of customizing data from the transmission of encryption data." ECF No. 66 at 3. "By separating out customizing data from encryption data and transferring only the customizing data on the bus and the encryption data via other 'hardwire' computer links, Gemalto designed a system that was supposed to be faster than prior systems." *Id.* But the `418 patent's "traffic cop" (*id.* at 2) can only direct customizing data down one road and encrypting data down another if the data sets are different and the system knows the difference. If Gemalto is right that "[a]ll data on a smart card is 'customizing' data, whether encrypted or not," ECF No. 82 at 7, 11, then the distinction between the different devices claimed in the patent (MPs and DEPs, communicating via different channels) falls apart. And if Gemalto is wrong and customizing and encryption data are different, then we are left (impermissibly) to wonder what the "customizing data server"/"device[] for customizing data" *is*—because despite Gemalto's arguments it certainly cannot be the DEP.[3]

Gemalto's attempt to turn "customizing" and "encrypting" into synonyms based on alleged prior art disclosures fails, as well. Neither the '011 patent (Ex. 3 to Gemalto's brief) nor the '424 application (Ex. 4 to Gemalto's brief) even mention "customizing data," "customizing data server," or "devices for customizing data,"[4] much

---

[3] Gemalto's odd question of "how … the encrypted data get[s] onto the smart card," Dkt. 82 at 7, is answered by the patent itself: via dedicated links that connect the management interface to the customizing machines, depicted in Figure 1 as "LS" links. `418 pat. at 4:21-23.

[4] Thus, Gemalto's cite to *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540 (Fed. Cir. 1983) for the proposition that "[l]anguage in prior art can evidence definiteness if one skilled in the art could have understood the term in the context of the invention," Dkt. 82 at 7 n.10, is irrelevant at best. And, of course, *Gore* was abrogated by *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (*en banc*).

less stand for Gemalto's proposition that "all data on a smart card is 'customizing' data, whether encrypted or not." See e.g., ECF No. 82-5 at 4:24-27 (describing "three major types of information: application data, security data, and printed data"). Certainly, some information on a particular smart card (the microchip's operating system, data structure, issuer, and so on) is generic rather than customized; indeed, if *all* data on a smart card is "customizing" data then the adjective "customizing" means nothing.

Gemalto also misleadingly cites to the discussion of the prior art (at pp. 8-9) from the patent's "Background of the Invention" to support its strained synonym argument. But the patent says only that the process of "record[ing] data issuing from a data and calculation file in the memory of a microcircuit" is "called 'customization' of the microcircuit card." `418 Pat. at 1:15-20. This excerpt does not show that the encrypting data peripheral is the same as the customizing data server, nor does it show that the patent "intends for 'customizing' to encompass 'encrypting.'" ECF No. 82 at 8. "Encrypting" is not mentioned at all.

Likewise, Gemalto misrepresents this section as discussing only one peripheral device, when it actually discusses two: one for customizing data ("a peripheral device via a communication bus") and one for encrypting data ("a peripheral encrypting device capable of calculating the certificates for creating each file"):

> BACKGROUND OF THE INVENTION
>
> The invention relates to smart cards and, more particularly, a system for the mass customizing of microcircuit cards.
>
> Microcircuit card means a plastic card in the thickness of which a microcircuit is housed. According to the usage of the card, it is necessary to record data issuing from a data and calculation file in the memory of a microcircuit, notably a chip with or without a microprocessor. These operations are called "customization" of the microcircuit card and are carried out by a customizing machine. The time taken to carry out these operations is between 15 and 30 seconds per card for cards used in mobile telephones, for example.
>
> These operations are carried out by a machine comprising several customizing lines or appliances in parallel, which each comprise a reader/encoder in which the customizing program is downloaded and which functions autonomously by means of a microprocessor.
>
> ==The customized data of each card are supplied to the reader/encoder by a peripheral device via a communication bus associated with a control device.==
>
> However, in order to take account of the security aspects, it is necessary to provide additional functions, such as:
>
> calculating so-called transportation keys for releasing the microcircuit before the customizing operations,
>
> calculating a session key for protecting the data to be introduced into the card, and
>
> calculating a certificate which authorises the creation of a directory or a file.
>
> These functions entail a dialogue between each customizing appliance and a peripheral device, notably for each file or directory creation, and hence a very high exchange of data.
>
> ==At the present time, these data exchanges are effected by means of a communication bus which connects each customizing appliance, station or line to a peripheral encrypting device capable of calculating the certificates for creating each file, and this for each card.== However, the capacity of the bus is insufficient for Managing such a volume of data exchanges.

Thus, the materials relied upon by Gemalto do not support Gemalto's notion that encryption data and customization data are coextensive. Nor does this excerpt inform a person of skill in the art what the `418 patent means by "customizing data server"/"devices for customizing data."[5]

---

[5] For purposes of this indefiniteness brief only, CPI adopts Gemalto's definition.

### C. The specification does not provide any insight to a person of ordinary skill as to what a "customizing data server" is or where it might 'sit' in the disclosed architecture

As noted, Gemalto concedes that the patentee did not define "customizing data server" or "devices for customizing data." But it argues that a person of ordinary skill would know that "[c]ustomizing data includes any of the data that personalizes a smart card." ECF No. 82 at 10. But it does not offer the testimony of a person of ordinary skill, nor does it cite to a single reference that uses the term "customizing data," much less "customizing data server."

Gemalto looks for support for the "customizing data server" phrases in the `418 patent's specification, but merely copying and pasting the *claim language* into the specification does not provide any more guidance to a person of ordinary skill as to what these terms mean. ECF No. 82 at 11. It does not follow that just because a person of ordinary skill might know what "customizing data" is (which has yet to be established) and likewise might know what a "data server" is does not mean that he would know, in the context of *this* patent, what a "customizing data server" is. This argument is a non-starter.

Another non-starter is Gemalto's position that CPI is actually arguing that these are means-plus-function terms. Notwithstanding the fact that CPI is not arguing that *at all* (and Gemalto cites to nothing in CPI's brief to support such a contention), it bears mentioning that *Gemalto* has proposed a construction for this term that explicitly relies on "the structure in the terms of what must be defined by what it does": "… is capable of at least receiving requests … and sending data …." ECF No. 82 at 2. CPI is arguing

instead that a person of ordinary skill would not know what the customizing data server *is*, even before he could consider what it ***does.***

Because the specification does not "adequately explain[]" the customizing data server's function or how it interacts with the other claimed components, the claims that incorporate that phrase (or its sister, "devices for customizing data") are indefinite. *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1321 (Fed. Cir. 2008).

> **D.    Gemalto's claim differentiation argument fails**

Gemalto argues that, because claims 1 and 13 call for a "customizing data server" or "device[] for customizing data," claims 8 and 16 require "additional customizing data," and claim 15 discloses "devices that provide cryptographic data," the "customizing data server" phrases must include "encrypting data." ECF No. 82 at 9-10. This makes no sense: there is no requirement in claims 1 and 13 that all the customizing data must be supplied by a single customizing data server. Claims 8 and 16 claim *additional* devices; claim 15 refers to "cryptographic data," not "encryption data." These dependent claims add flesh to the two independent claims, but do nothing to illuminate the meaning of "customizing data server."

Worse, Gemalto's claim differentiation argument relies entirely on the proposition that the DEP in Figure 1 is a customizing data server. But the inescapable reality is that Figure 1—the only figure depicting the invention as a whole—shows a control device connected to the customizing station via a communication bus. This device cannot be the customizing data server because it is not on the correct side of the management

interface: it lives ***inside*** the customizing machine.  So Gemalto's argument does not solve Gemalto's indefiniteness problem.

In fact, the dependent claims support CPI's position.  This essential feature of the invention is clearly included in the independent claims.  Claims 1 and 13 specifically require "links," while claims 8 and 17, depending from claims 1 and 13 respectively, requires, require something other than "links": respectively a "communication bus" and "means separate from serial links."  The patentee distinguished prior art based on the nature of the "links" and this specific separation of classes of data (customizing versus encrypting) during prosecution.  *See, e.g.* Ex. D at GEMALTO00000502 ('418 Applicant remarks dated July 24, 2002)("As a further feature of the invention, the delivery of the encrypted data from the devices DEP is separate from other data delivered via a control device DC."); *see also*, *id.* at 503 ("The architecture of the present invention, as recited in claim 1, results in the advantages described in the specification .... The Tushie patent does not provide any details on the manner in which data exchanges are managed, and therefore fails to suggest a system which provides these same advantages").

### E. Gemalto's other arguments fare no better

The rest of Gemalto's arguments need not long detain us.

First, the fact that the PTO did not reject any claims based on indefiniteness does not mean that the disputed terms are definite.  *Microstrategy Inc. v. Bus. Objects Americas*, 410 F. Supp. 2d 348, 360 (D. Del. 2006), *aff'd,* 238 F. App'x 605 (Fed. Cir. 2007) (finding claims indefinite despite no objection being made to the language in the prosecution history).

-12-

Second, CPI has not argued that the sole embodiment disclosed in the patent must be read into the claims. The problem is that the sole embodiment actually teaches away from the claims – leaving a person of ordinary skill with no direction as to what the "customizing data server" is. The specification *as a whole*, does not provide any direction (within that one embodiment or elsewhere) that provides any information as to what a customizing data server is, where it is located, and how it functions. This criticism *includes* Figure 1 but is not based exclusively on it. Tellingly, Gemalto concedes that Figure 1 "capture[s] the essence of the invention," *Secure Web Conference Corp. v. Microsoft Corp.*, 640 F. App'x 910, 914 (Fed. Cir. 2016), but then annotates Figure 1 with labels that are not described or disclosed in the specification. Gemalto concedes that no definition is provided and points to no other figure or disclosure to support what the customizing data server actually is.

Third, Mr. Maurel's testimony is relevant to the question of indefiniteness and, therefore, to the reasonable scope of the claims. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) ("authoriz[ing] district courts" to rely on inventor testimony in understanding the meaning of claim terms). He testified that encrypting data and customizing data were intended to be kept separate. *See e.g.*, ECF No. 79 at 26-27. As the inventor and therefore a person of ordinary skill, *even he* could not identify the system as claimed, at least in part because Figure 1 (and the disclosure) did not represent his invention. *See e.g., id.* at 89. If the claims as issued do not reflect the actual invention, then it is even less likely that a person of ordinary skill would be reasonably informed as to the scope of the alleged invention in view of *this*

-13-

specification.  *See Trusted Knight Corp. v. Int'l Bus. Machines Corp.*, No. 2016-1510, 2017 WL 899890, at *4 (Fed. Cir. Mar. 7, 2017) (holding a claim term indefinite where the claim language itself contradicted the patent owner's discussion of the specification).

Mr. Maurel's testimony, in this context, differs from the cases Gemalto cited (pp. 16-17) at least because his testimony serves the proper purposes of (1) providing objective evidence of how a person of ordinary skill would understand claim terms and (2) explaining the claimed invention as well as its development.  CPI is not required to designate Mr. Maurel as an expert in order for the Court to consider his testimony, because everything he said is rationally based on his own perception and factual knowledge.  *See e.g.*, Fed. R. Evid. 602, 701.  And his testimony does not involve what he subjectively intended to cover by including certain claim terms in the '418 patent— indeed, he had no role whatsoever in the U.S. patent prosecution process.  ECF No. 79 at 96:4-6.  The *Howmedica* case cited by Gemalto stands only for the proposition that "[t]he testimony of an inventor 'cannot be relied on to *change the meaning* of the claims.'"  540 F.3d 1337, 1346 (Fed. Cir. 2008) (emphasis added).  CPI instead offers his testimony for the proper purpose of "understanding the established meaning of particular terms in the relevant art."  *Id.* at 1347 n.5.

## II.     **CONCLUSION**

Gemalto cites to no art that uses the phrases "customizing data server" or "devices for customizing data" (or, for that matter, even a reference that uses the term "customizing data").  It does not provide a declaration by a person of ordinary skill offering a

-14-

conventional definition of either phrase.  Figure 1 doesn't disclose it.  The specification does not describe it.  The inventor doesn't recognize it.  The phrases "customizing data server" and "devices for customizing data" are indefinite.

Dated:  June 8, 2017

Krishnan Padmanabhan, NY Bar No. 4757183
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
Email: kpadmanabhan@winston.com

Louis L. Campbell, CA Bar No. 221282
James C. Lin, CA Bar No. 271673
275 Middlefield Road, Suite 205
Menlo Park, CA 94025
Telephone: (650) 858-6500
Facsimile: (650) 858-6550
Email: LLcampbell@winston.com
Email: jalin@winston.com

Winston & Strawn, LLP

By: */s/ David S. Bloch*

David S. Bloch, CA Bar No. 184530
101 California Street
San Francisco, CA 94111-5802
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
Email: dbloch@winston.com

Dustin Edwards, Texas Bar No. 24042335
Melinda K. Lackey, Texas Bar No. 24062418
1111 Louisiana, 25th Floor
Houston, TX 77002
Telephone: (713) 651-2600
Facsimile: (713) 651-2700
Email: dedwards@winston.com
Email: mlackey@winston.com

**COUNSEL FOR DEFENDANT, CPI CARD GROUP INC.**

## CERTIFICATION OF COMPLIANCE WITH D.C.COLO.LPTR. 17

The undersigned hereby certifies that CPI's claim construction brief consist of 3504 words (inclusive of certifications), which is less than the total words permitted by the rules of court. Counsel relies on the word count of the computer program used to prepare this brief.

Date: June 8, 2017

/s/ Melinda K. Lackey
Melinda K. Lackey

## CERTIFICATION OF SERVICE

The undersigned hereby certifies that on June 8, 2017, the foregoing CPI CARD GROUP INC.'S REPLY IN SUPPORT OF ITS CLAIM CONSTRUCTION BRIEF was served on all counsel of record by filing the document using the Court's CM/ECF system, which provides electronic notification to all counsel of record in this case.

/s/ Ying Lin Steinberg
Ying Lin Steinberg
Paralegal